Nancy HODGKINS, Colin Hodgkins by Next Friend and Natural Parent Nancy Hodgkins, Caroline Hodgkins, by Next Friend and Natural Parent Nancy Hodgkins, Plaintiffs,

v.

Bart PETERSON, in his official capacity as Mayor of the City of Indianapolis, et al., Defendants.

IP 01–1032–C T/K.

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 6, 2001.

---

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, for plaintiffs.

A. Scott Chinn, Corp. Counsel for the City of Indianapolis, Thomas M. Fisher, Indianapolis, IN, for defendants.

## ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

TINDER, District Judge.

This case presents yet another constitutional challenge to a nighttime juvenile curfew law in the State of Indiana. Plaintiffs, Nancy Hodgkins, and Colin and Caroline Hodgkins, on their own behalf and as representatives of all parents and legal guardians of minors who are residents of Marion County, Indiana and all minors

who are residents of Marion County, Indiana, respectively, challenge the constitutionality of Indiana's new juvenile curfew law enacted earlier this year. They claim the law is unconstitutionally overbroad because it violates minors' First Amendment rights as it subjects to arrest minors engaged in First Amendment activities. Plaintiffs also claim that the law unlawfully impinges upon the substantive due process rights of parents and legal guardians to raise and control their minor children. Plaintiffs seek a preliminary injunction against Defendants Bart Peterson, in his official capacity as Mayor of the City of Indianapolis, Jack Cottey, in his official capacity as Sheriff of Marion County, and Scott Newman, in his official capacity as Prosecutor of Marion County. The State of Indiana has intervened to defend the constitutionality of the new juvenile curfew law. Plaintiffs seek to enjoin Defendants from enforcing the curfew law. Defendants oppose the motion. Upon considering the motion and the parties' submissions and having heard oral argument, the court concludes that Indiana's new curfew law withstands constitutional challenge.

## I. FINDINGS OF FACT[1]

Indiana has in effect a juvenile curfew law which makes it unlawful for a child fifteen, sixteen or seventeen years of age to be in a public place: between 1 a.m. and 5 a.m. on Saturday or Sunday; after 11 p.m. on Sunday, Monday, Tuesday, Wednesday or Thursday; or before 5 a.m. on Monday, Tuesday, Wednesday, Thursday, or Friday. *See* Ind.Code § 31–37–3–2. For a child less than fifteen years of age, it is unlawful for such child to be in any public place after 11 p.m. or before 5 a.m. on any day. *See* Ind.Code § 31–37–3–3. Under Indiana's curfew law:

(a) It is a defense to a violation under this chapter that the child was emancipated ... at the time that the child engaged in the prohibited conduct.

(b) It is a defense to a violation under this chapter that the child engaged in the prohibited conduct while:

(1) accompanied by the child's parent, guardian or custodian;

(2) accompanied by an adult specified by the child's parent, guardian or custodian;

(3) participating in, going to, or returning from:

(A) lawful employment;

(B) a school sanctioned activity;

(C) a religious event;

(D) an emergency involving the protection of a person or property from an imminent threat of serious bodily injury or substantial damage;

(E) an activity involving the exercise of the child's rights protected under the First Amendment to the United States Constitution or Article 1, Section 31 of the Constitution of the State of Indiana, or both, such as freedom of speech and the right of assembly; or

(F) an activity conducted by a nonprofit or governmental entity that provides recreation, education, training, or other care under the supervision of one (1) or more adults; or

(4) engaged in interstate or international travel from a location outside of Indiana to another location outside Indiana.

Ind.Code § 31–37–3–3.5.[2] A child under 18 years of age commits a delinquent act if he

---

1. Any Finding of Fact more appropriately considered a Conclusion of Law should be so construed, and vice versa; the labels given findings and conclusions are not controlling.

2. As Plaintiffs note, there is some overlap between subdivisions (3)(C) and (3)(E), *see* U.S. Const. amd. I.

or she violates the curfew law, see Ind. Code § 31–37–2–5. An adult commits the crime of contributing to the delinquency of a minor if he or she "knowingly or intentionally encourages, aids, induces, or causes a person under eighteen (18) years of age to commit an act of delinquency (as defined by IC 31–37–1 or IC 31–37–2)." Ind.Code § 35–46–8–1.

Indiana's new curfew law was enacted in response to this judge's decision striking down the curfew law, Indiana Code Section 31–37–3–1 (repealed 2001), see *Hodgkins v. Goldsmith,* No. IP 99–1528–C–T/G, 2000 WL 892964 (S.D.Ind. July 3, 2000), *amended by* 2000 WL 1201599 (S.D.Ind. July 20, 2000) (*Hodgkins I* ).[3] *Hodgkins I* holds that the former curfew law was overly broad and not narrowly tailored to serve the State's significant interests because it lacked an exception for First Amendment activities.

Also in response to this court's decision in *Hodgkins I,* the City of Indianapolis adopted a juvenile curfew ordinance containing an express exception for First Amendment activities. That ordinance was challenged under the Fourteenth Amendment as an unlawful impingement upon the substantive due process right of parents and legal guardians to raise and control their children without undue government interference, see *Hodgkins v. Peterson,* No. IP00–1410–C–T/G, 2000 WL 33128726 (S.D.Ind. Dec. 14, 2000) (*Hodgkins II* ). The challenge proved unsuccessful as the undersigned denied the plaintiff's motion for preliminary injunction, concluding that she had not shown some likelihood of succeeding on the merits of her claim. The decisions in both *Hodgkins I* and *Hodgkins II* were appeal-

ed to the Court of Appeals for the Seventh Circuit. During the pendency of those appeals, the Indiana General Assembly enacted the current curfew law, thus mooting the appeals which then were dismissed.

Plaintiff Nancy Hodgkins is a Marion County resident. Plaintiffs Colin Hodgkins and Caroline Hodgkins are two of her minor children. Ms. Hodgkins, on behalf of her minor children, wants them to have the opportunity to participate in activities protected by the First Amendment, but believes that, given the Indiana curfew law, they will run the risk of being arrested if they engage in these activities. Plaintiffs believe that there are other youths who may wish to engage in activities protected by the First Amendment, including religious, free speech, and assembly activities, who will be discouraged from doing so since they are subject to arrest under the amended curfew law even if they are engaging in these activities.

Nancy Hodgkins desires to assert her rights, as a parent, to give her children more privileges and responsibilities as they grow older if she believes that they can handle them. She believes this is part of a parent's job of preparing a child for adulthood and should involve the parent having the right to determine if his or her child is mature enough to accept the responsibility of being out late, possibly past curfew hours. Nancy Hodgkins believes that a parent has the right to decide how late the child will be out depending on who they are with, what they are doing, and where they are going. She believes that the curfew law deprives parents of the right to allow their children to be in public, with parental permission, after the times

---

3. The former curfew law provided that the statute did not apply to a child who is "(1) accompanied by the child's parent, guardian, or custodian; (2) accompanied by an adult specified by the child's parent, guardian, or custodian; or (3) participating in, going to, or returning from: (A) lawful employment; (B) a school sanctioned activity; or (C) a religious event." Ind.Code § 31–37–3–1.

proscribed by the law and indeed makes it a crime, under Indiana Code Section 35–46–1–8, for a parent to allow a child to be out after curfew unless the child is planning to engage in the behavior specified in the defenses to a curfew violation listed in Indiana Code Section 31–37–3–3.5.

Defendant Bart Peterson is the duly elected Mayor of the City of Indianapolis, Indiana. Defendant Jack Cottey is the duly elected Sheriff of Marion County, Indiana, which encompasses the City of Indianapolis. Defendant Scott Newman is the duly elected Prosecutor of Marion County, Indiana.

The evidence supports a finding that crime in Indianapolis and Marion County increases at night and that children are thus most vulnerable to victimization at night.[4] (*See* Aff. of Jeffrey S. Decker ¶ 14 ("the nocturnal curfew hours are some of the busiest hours for IPD [Indianapolis Police Department] in terms of addressing and dealing with criminal offenses generally, the curfew hours are, in my experience, the most dangerous hours for juveniles to be out … without adult supervision"); Aff. of Timothy J. Motsinger ¶ 20 ("during the nocturnal [curfew] hours … young people were the most vulnerable to and at risk of victimization"); Aff. of Richard Witmer ¶ 7 (stating that the busiest hours for the Beech Grove Police Department "were between the hours of 6 p.m. to 6 a.m. and, therefore, were potentially dangerous hours for juveniles because of lack of adult supervision"); Aff. of Brian Toepp ¶ 6 ("The community is also at risk due to the fact that those children who are in the community during the 'curfew' time … have a high risk of becoming victims. . . .")).

---

4. This evidence was presented in *Hodgkins II* and is incorporated by reference without any

## II. CONCLUSIONS OF LAW

### A. PRELIMINARY INJUNCTION

 "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quotation omitted); *see also Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir.2001) ("A preliminary injunction is an extraordinary remedy[.]"), *reh'g en banc denied*. A party seeking a preliminary injunction must demonstrate some likelihood of success on the merits, an inadequate remedy at law, and irreparable harm if the preliminary injunction is denied. *See, e.g., O'Bannon*, 259 F.3d at 770. If the moving party demonstrates these elements, then the court must balance the harm to the nonmovant if an injunction is granted, the harm to the movant if the injunction is denied, and the public interest. *See, e.g., id.* Courts in the Seventh Circuit use what has been described as the sliding scale approach: "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

The battle in this case, however, is solely over Plaintiffs' likelihood of success on the merits. Defendants do not dispute, and the court finds, that Plaintiffs have established the other elements necessary for an injunction to issue. The court, therefore, turns to Plaintiffs' likelihood of success on the merits.

---

objection from Plaintiffs.

## B. FIRST AMENDMENT CHALLENGE

Plaintiffs first claim that the new curfew law is facially overbroad in violation of the First Amendment, applicable to the States through the Fourteenth Amendment, *see Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Plaintiffs contend that because the new curfew law makes participation in First Amendment activities a defense rather than an exception, minors participating in such activities may be lawfully arrested, thus creating an unreasonable chill on the minors' constitutional rights.

■■■■ Generally, a party lacks standing to assert the rights of others. "The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 38, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999) (quotation omitted). An exception to this rule is the First Amendment overbreadth doctrine which allows a plaintiff "to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute." *Alexander v. United States*, 509 U.S. 544, 555, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993); *see also Hodgkins I*, 2000 WL 892964, at *7 (S.D.Ind. July 3, 2000) (quoting *Gooding v. Wilson*, 405 U.S. 518, 520–21, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965))), *amended by* 2000 WL 1201599 (S.D.Ind. July 20, 2000). Thus, the overbreadth doctrine allows a plaintiff to establish standing where he or she otherwise could not. *See, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 611–12, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

■■■ The doctrine is not "casually employed." *Los Angeles Police Dep't*, 528 U.S. at 39, 120 S.Ct. 483; *see also Nat'l Endowment of the Arts v. Finley*, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) ("Facial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.' ") (quoting *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908). " '[F]acial overbreadth ... attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws....' " *Los Angeles Police Dep't*, 528 U.S. at 39–40, 120 S.Ct. 483 (quoting *New York v. Ferber*, 458 U.S. 747, 770, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)).

■■■ When deciding a facial overbreadth challenge, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 458–59, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Kolender v. Lawson*, 461 U.S. 352, 359, n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). If it does not, then the overbreadth challenge fails. *See Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. 1186. As the court stated in *Hodgkins I:* "Where the nature of the First Amendment right at issue is expressive conduct, as opposed to pure speech, 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' " *Hodgkins I*, 2000 WL 892964, at *7 (quoting *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908); *see also Finley*, 524 U.S. at 580, 118 S.Ct. 2168 ("To prevail [on an overbreadth challenge], respondents must

demonstrate a substantial risk that application of the provision will lead to the suppression of speech.") (quoting *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908); *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (overbreadth requires a finding of "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.").

█ When seeking to enjoin the application of a statute as unconstitutional, the moving party must overcome a strong presumption of constitutionality. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 629, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Bowen v. Kendrick*, 487 U.S. 589, 618, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). As a corollary to that presumption, a federal court is required to construe a statute to be constitutional if possible. *See Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 508 (7th Cir.1998). So, if a statute may be read in a way such that it comports with the Constitution, then it will be enforced.

### 1. Is A First Amendment Exception Required?

Before considering Plaintiffs' challenge, the court needs to address a side distraction presented by Defendants. They maintain that Indiana's curfew law need not contain an express exception or defense for First Amendment activities. Thus, they ask the court to reconsider its holding in *Hodgkins I*. See *Hodgkins I*, 2000 WL 892964, at *16–17. This the court declines to do. As the court concluded in that decision: "without a general First Amendment activities exception, a curfew law is overbroad." *Id.* at *16. That conclusion and the court's reasoning, see *id.* at *13–18, is just as sound today as

it was last year when *Hodgkins I* was decided.

The State advances additional arguments for its position that no First Amendment activities exception is required of a juvenile curfew law that warrant consideration. The State first argues that the decision in *Gresham v. Peterson*, 225 F.3d 899, 906–07 (7th Cir.2000) (holding city ordinance banning nighttime panhandling and "aggressive panhandling" and limiting panhandling in public places did not violate First Amendment free speech rights), along with Supreme Court authority on time, place and manner restrictions, leads to the conclusion that a curfew law need not have an express First Amendment activities exception. The court does not read *Gresham* as broadly as the State. The panhandling ordinance banned a specific nighttime activity, panhandling, whereas, the curfew law bans all activities of minors in any public place during curfew hours, subject to certain defenses. Certainly the latter is much broader and sweeping than the former. *Cf. Nunez v. City of San Diego*, 114 F.3d 935, 950 (9th Cir.1997) (describing a nocturnal juvenile curfew law as an "all-encompassing restriction"). The curfew law is more akin to the law imposing a "total citywide ban on panhandling" which was held to violate the First Amendment, see *Loper v. New York City Police Department*, 999 F.2d 699, 705–06 (2d Cir. 1993), and distinguished by the *Gresham* court, see *Gresham*, 225 F.3d at 907. To demand a First Amendment activity exception to a juvenile curfew law where none is required of an ordinance banning nighttime panhandling does not appear to be incongruous. Like the *Gresham* court, however, this court applies the standards governing time, place and manner restrictions on First Amendment expressive rights. While cognizant of the general rules of law that come from the Supreme Court cases relied upon by the State in

making this argument, see, *e.g., Clark v. Community for Creative Non Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), and *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the court is of the opinion that the decisions directly addressing juvenile curfew laws provide more guidance on the questions presently before the court.[5]

The State next contends that the cases upholding juvenile curfew laws do not explicitly hold that the Constitution demands a First Amendment activity exception. As this court has observed, "every reported federal case in which a curfew law has been upheld against constitutional challenge has involved a curfew law with ... an explicit First Amendment exception." *Hodgkins I,* 2000 WL 892964, at *14 (citing *Hutchins v. District of Columbia,* 188 F.3d 531, 535 (D.C.Cir.1999) (en banc); *Schleifer v. City of Charlottesville,* 159 F.3d 843, 846 (4th Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999); *Qutb v. Strauss,* 11 F.3d 488, 498 (5th Cir.1993), *cert. denied,* 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994); *Ramos ex rel. Ramos v. Town of Vernon,* 48 F.Supp.2d 176, 178 (D.Conn. 1999); *Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1246 (M.D.Pa. 1975), *aff'd mem.,* 535 F.2d 1245 (3d Cir.), *cert. denied,* 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976)). Moreover, as this court recognized in *Hodgkins I:* "each of the courts upholding curfew laws against constitutional challenge indicated the im-

portance of the First Amendment activities exception." *Hodgkins I,* 2000 WL 892964, at *15–16 (citing cases). This importance is not lost on the court. When read as a whole, the cases upholding curfew laws against First Amendment challenges do impose a First Amendment activity exception or defense requirement, even though this requirement may not be explicit.

■■■ *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), teaches that in addition to speech, First Amendment scrutiny is applied to (1) "regulation of conduct that has an expressive element," *id.* at 703, 106 S.Ct. 3172, and (2) "regulations that impose a disproportionate burden upon those engaged in protected First Amendment activities." *Id.* at 703–04, 106 S.Ct. 3172.[6] In its brief and at oral argument, the State has argued that the curfew law regulates minors' nighttime activities rather than expressive conduct. The State relies on *Hutchins* to support this argument. The District of Columbia Circuit in *Hutchins* found that the curfew law neither regulated nor proscribed expression. *Hutchins,* 188 F.3d at 548. Then, with little explanation, the court concluded the curfew law did not regulate expressive conduct. *Id.* ("The curfew regulates the activity of juveniles during nighttime hours; it does not, by its terms, regulate expressive conduct."). This court, however, in contrast, finds that by prohibiting minors from being in public places during curfew hours a curfew law does regulate some expressive conduct. *See Hodgkins I,* 2000 WL

---

**5.** In any event, the court need not reconsider its holding in *Hodgkins I* as the new curfew law does contain a First Amendment activities defense. Of course, the court would need to reconsider *Hodgkins I* were it to find that the curfew law unlawfully burdened minors' First Amendment rights.

**6.** *Arcara* held that enforcement of a state statute authorizing closure of premises used as a

place for prostitution and lewdness against a bookstore did not implicate the First Amendment. 478 U.S. at 704–07, 106 S.Ct. 3172. The Court concluded that the statute did not regulate expressive conduct, *id.* at 705, 706 n. 3, 106 S.Ct. 3172, and rejected the argument that it disproportionately burdened those engaged in First Amendment activities, *id.* at 705–07, 106 S.Ct. 3172.

892964, at *7-8 (noting limitations on over-breadth challenges to expressive conduct and stating that the time, place and manner analysis is appropriate); *cf. Nunez,* 114 F.3d at 950 (curfew ordinance regulated the expressive conduct of minors). And, it is difficult to understand how the curfew in *Hutchins* covered *all* activities of juveniles yet failed to regulate expressive conduct. Certainly, expressive conduct falls within the ambit of "all activities".

The State contends that *Hutchins* does not hold that a First Amendment exception is necessary to avoid a disproportionate burden on those engaged in First Amendment activities. Following *Arcara* and having decided the curfew ordinance did not regulate expressive conduct, the *Hutchins* court concluded that the curfew was subject to First Amendment scrutiny only if it imposed a disproportionate burden on those engaged in First Amendment activity. *Hutchins,* 188 F.3d at 548 (citing *Arcara,* 478 U.S. at 703-04, 106 S.Ct. 3172). The court held that the law did not impose such a burden because it covered all activity and provided a specific defense for those engaged in First Amendment activities. *Id.* The State says that *Hutchins* cannot be read as requiring a First Amendment exception to avoid a disproportionate burden. It may be right, but this is beside the point as the undersigned has concluded that the curfew law regulates some expressive conduct. This conclusion necessitates scrutiny under the First Amendment. *See Arcara,* 478 U.S. at 703, 106 S.Ct. 3172.

The State argues that the decisions in *Nunez, Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981), and *Waters v.* *Barry,* 711 F.Supp. 1125 (D.D.C.1989), striking down curfew ordinances lacking First Amendment exceptions also are unpersuasive. The State contends that the *Nunez* court erred in subjecting the curfew ordinance to First Amendment scrutiny in the first instance. The State misreads *Arcara* and *Nunez.* The *Nunez* court concluded that the curfew ordinance regulated conduct with an expressive element, *see Nunez,* 114 F.3d at 950 ("The ordinance does, however, restrict minors' ability to engage in many First Amendment activities during curfew hours."), *see also id.* at 950-51; it therefore correctly applied *Arcara* in subjecting the curfew ordinance to First Amendment scrutiny.[7] The State then conflates the second prong of the *Arcara* inquiry (disproportionate burden) for determining whether the First Amendment is implicated with the narrowly tailored requirement of the time, place and manner analysis. Thus, this second challenge to the analysis in *Nunez* is unavailing.

The *Johnson* and *Waters* decisions are unpersuasive, the State argues, because they focus on whether the curfew impinged First Amendment activity at all and do not take into account the government's interest in protecting minors. According to the State, the *Waters* court also erred because it found that the number of "innocent juveniles" exceeded the number of juveniles engaged in nocturnal crime. The *Johnson* and *Waters* courts did not apply the time, place and manner analysis,[8] but their conclusions that the curfew burdened minors' First Amendment rights is supported by sound reasoning and con-

**7.** The State's argument that being in public late at night is not integral to all First Amendment activity of minors (see Resp. Of Intervenor State Pls.' Mot. Prelim. Inj. at 9) concerns the alternate channels of communication prong of the time, place and manner analysis, rather than whether a curfew ordinance should be scrutinized under the First Amendment in the first place.

**8.** The *Waters* court expressly states that the curfew law is not narrowly drawn, however. *See Waters,* 711 F.Supp. at 1135.

sistent with the other decisions striking down curfew laws lacking a First Amendment activity exception or defense. It is these conclusions and reasoning upon which this court relies rather than any failure to consider the government's interest in protecting minors. Thus, the State fails to persuade the court that these two cases should not be followed.

Defendants have not convinced the court that it has erred in its conclusion that a juvenile curfew law needs a First Amendment activity exception, except to the extent that this entry clarifies that the protection afforded First Amendment rights need not be phrased as an exception. Rather, as the undersigned concludes herein, First Amendment rights may be adequately protected by a First Amendment activity defense. The court, therefore, declines Defendants' invitation to reconsider the holding in *Hodgkins I*.

### 2. Does The First Amendment Invalidate This Statute?

■ Now the court addresses the Plaintiffs' challenge to the new statute. As stated in *Hodgkins I*, the new curfew law is a time, place or manner restriction on the minors' First Amendment rights in public fora. Under *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the curfew law withstands constitutional challenge if it is (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leaves open ample alternative channels of communication. *Perry*, 460 U.S. at 45, 103 S.Ct. 948 (citations omitted); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Gresham v. Peterson*, 225 F.3d 899, 905 (7th Cir.2000); *Hodgkins I*, 2000 WL 892964, at *9. As with the former curfew law, no one disputes that the new curfew law is content-neutral. Plaintiffs, however, contend that the law is not narrowly tailored and fails to leave open ample alternative channels of communication.

■ The government has a compelling interest in providing for the safety and well-being of its children and combating juvenile crime. *See generally* Ind.Code § 31–10–2–1 (listing the general purposes of Indiana's family law statutes); *Sable Communications v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (holding that a ban on dial-a-porn is not appropriate for adults, although it might be for minors); *Schall v. Martin*, 467 U.S. 253, 264–65, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.... [C]rime prevention is a weighty social objective, and this interest persists undiluted in the juvenile context. The harm suffered by the victim of a crime is not dependent upon the age of the perpetrator. And the harm to society generally may even be greater in this context given the high rate of recidivism among juveniles.") (quotations omitted). The court may also safely assume that the government has a significant interest in promoting and supporting the relationships between parents and their minor children. Plaintiffs do not dispute that these are significant government interests; rather, they contend that the curfew law is not narrowly tailored to serve these interests.

■ In *Ward v. Rock Against Racism*, the Supreme Court held that the "narrow tailoring" requirement is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." 491 U.S. at 799, 109 S.Ct. 2746 (quotation omitted); *see also Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 297, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The Court continued:

this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.

*Ward,* 491 U.S. at 799–800, 109 S.Ct. 2746 (citation omitted). The Supreme Court has termed this "narrow tailoring" requirement for content-neutral restrictions to be an "intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citing, *inter alia, Ward*); *see also United States v. Wilson,* 154 F.3d 658, 664 (7th Cir.1998) ("Because we find that [the statute] is content- and viewpoint-neutral, it is subject to intermediate scrutiny. A statute survives intermediate scrutiny if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.") (quotation omitted). Therefore, the issue is not whether the new curfew law is the *least* restrictive alternative that could achieve the government's interests. *See Ward,* 491 U.S. at 797, 798–99, 109 S.Ct. 2746; *Gresham,* 225 F.3d at 906. Rather, the issue is whether "a substantial portion of the burden on speech [caused by the curfew law] does not serve to advance [the curfew law's] goals." *Ward,* 491 U.S. at 799, 109 S.Ct. 2746. So, the court must determine whether the new curfew law burdens minors' speech or other expression. And, as stated, since Plaintiffs' bring a facial overbreadth challenge, that

burden must be substantial, *see, e.g., Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908.

Plaintiffs claim the new curfew law burdens the minors' speech and expression because a child may be arrested even if he or she is participating in a First Amendment activity. This is so, they say, because under the new law participation in a First Amendment activity is an affirmative defense,[9] and an arresting officer need not consider affirmative defenses in determining probable cause to arrest. According to Plaintiffs, this burdens even more First Amendment rights than the former version of the law struck down by this court. The City Defendants respond that a probable cause determination, whether under federal or state law, must include consideration of affirmative defenses based on a constitutional right.

 "Probable cause" to make an arrest means the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *see also Brinegar v. United States,* 338 U.S. 160, 174–75, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *accord C.D.T. v. State,* 653 N.E.2d 1041, 1047 (Ind.App.1995). A determination of whether probable cause exists to make an arrest requires consideration of the "totality of the circumstances." *United States v. Rucker,* 138 F.3d 697, 700 (7th Cir.1998). The Indiana Supreme Court does not employ a probable cause analysis when determining whether an arrest violates the Indiana Constitution. Instead, the Court employs a reasonableness test based on

---

**9.** The statute's language includes "participating in, going to, or returning from" a First Amendment activity, but in the interests of brevity the court uses the terms "participation" and "participating" as short hand to cover all of these terms.

the totality of the circumstances. *See Baldwin v. Reagan,* 715 N.E.2d 332, 337 (Ind.1999); *Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995). Thus, whether subject to federal probable cause analysis or reasonableness analysis under the Indiana Constitution, an arrest must be considered in light of the totality of the circumstances.

Plaintiffs argue that under the new curfew law a police officer has probable cause to arrest a minor even if that minor is or was participating in a legitimate First Amendment activity. They maintain that in determining probable cause under the new curfew law, an officer need only decide whether a child is under the age of 18 and in public during the prescribed time period but need not consider any affirmative defenses. In support, Plaintiffs rely on a number of cases for the general rule that in determining probable cause an arresting officer does not have to consider the validity of any defense, see *Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (dismissing Section 1983 claim where plaintiff conceded sheriff executed facially valid arrest warrant but claimed sheriff should have investigated to determine that wrong person was in jail); *United States v. Reed,* 220 F.3d 476, 478 (6th Cir.2000) (stating that probable cause to arrest for criminal trespass does not require officers to consider whether defendant had a privilege to be on property), *cert. denied,* 531 U.S. 1103, 121 S.Ct. 842, 148 L.Ed.2d 722 (2001); *Humphrey v. Staszak,* 148 F.3d 719, 724 (7th Cir.1998) (stating "[P]robable cause to arrest is not necessarily negated by a defendant's successful assertion at trial of an entrapment defense."); *Linn v. Garcia,* 531 F.2d 855, 861 (8th Cir.1976) ("[T]he arresting officer is not required to conduct a trial before determining to make the arrest."); *Piazza v. Mayne,* 23 F.Supp.2d 658, 662 (E.D.La.1998) ("The affirmative defense ... does not weaken the fact that, at the time [of the arrest the defendant officer] had probable cause...."); *Corbett v. Goode,* No. CIV.A. 87–7360, 1990 WL 181499, at *5 (E.D.Pa. Nov. 19, 1990) ("The availability of an affirmative defense ... has nothing to do with whether ... probable cause, existed at the time of arrest ....") (emphasis in original).

■ But even Plaintiffs concede that an exception to the general rule exists when the arresting officer actually has knowledge of facts and circumstances conclusively establishing an affirmative defense. In *Estate of Dietrich v. Burrows,* 167 F.3d 1007 (6th Cir.1999), the Sixth Circuit considered whether the defendant police officers were entitled to a qualified immunity defense against a Fourth Amendment claim arising out of their arrest of the plaintiffs who claimed they had been arrested without probable cause. The court rejected the defendants' argument that it was not "clearly established" at the time of the arrest that a police officer must consider an arrestee's claim of an affirmative defense in determining whether probable cause exists. *Id.* at 1012. The court said: "The law has been clearly established since at least the Supreme Court's decision in *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925), that probable cause determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*" *Id.* (emphasis in original). Because the officers "had full knowledge of facts and circumstances that conclusively established, at the time of the ... arrests, that the plaintiffs were justified—by statute—in carrying concealed weapons during their work," the court concluded defendant police officers lacked probable cause to believe the plaintiffs violated the law. *Dietrich,* 167 F.3d at 1012. The court held therefore that the defendants were not entitled to qualified immunity. *Id.*

■ Thus, *Dietrich* holds that in determining whether probable cause to arrest exists, a police officer must consider all facts and circumstances within that officer's knowledge, including facts and circumstances conclusively establishing a statutory affirmative defense. See also *Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir.2000) (stating "the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence"); *Painter v. Robertson,* 185 F.3d 557, 571 (6th Cir.1999) (stating that an officer "in assessing probable cause to effect an arrest, may not ignore information known to him which proves that the suspect is protected by an affirmative legal justification for his suspected criminal actions"); *cf. Radich v. Goode,* 886 F.2d 1391, 1396–97 (3rd Cir.1989) (assuming without deciding that in determining probable cause arresting officers should consider facts establishing affirmative defenses). That is, if a police officer has knowledge of facts and circumstances which establish an affirmative defense, he or she lacks probable cause to arrest, even when the facts and circumstances establish that the person meets all elements of the offense. That is not to say that a police officer must investigate the individual's claims of an affirmative defense to determine facts then unknown to him or her.

Nothing in the cases relied upon by Plaintiffs conflicts with *Dietrich's* holding. In *Baker v. McCollan* the Supreme Court said: "we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." 443 U.S.

at 145–46, 99 S.Ct. 2689. *Dietrich* does not require an independent investigation by the arresting officer. Nothing in *Reed* suggests the arresting officers had knowledge of any facts giving rise to the alleged privilege. Nor is there any indication in *Linn* that the arresting officers had knowledge of any facts that would negate their belief that the plaintiff was committing the offense of public drunkenness. In *Piazza,* the court concluded that the existence of an affirmative defense does not defeat the existence of probable cause. 23 F.Supp.2d at 662. But the arresting agent had no knowledge of the facts giving rise to the affirmative defense, and would have had to conduct an investigation to determine the facts establishing the affirmative defense, *id.* at 659–60, which the law does not require, *see, e.g., Baker,* 443 U.S. at 145–46, 99 S.Ct. 2689. Neither *Humphrey* nor *Simmons v. Pryor,* 26 F.3d 650 (7th Cir. 1993), relied upon by *Humphrey,* address whether an arresting officer has probable cause to make an arrest when he or she has knowledge of facts and circumstances establishing an affirmative defense to the alleged crime.[10] Indeed, *Humphrey* notes that "probable cause to arrest is *not necessarily* negated by a defendant's successful assertion at trial of an entrapment defense[,]" 148 F.3d at 724, leaving open the possibility that there are times when probable cause is negated by an officer's knowledge of facts supporting an affirmative defense. Plaintiffs cite no authority for the proposition that in making a probable cause determination an officer cannot consider facts and circumstances establishing an affirmative defense.

**10.** The City Defendants err in attempting to distinguish *Humphrey* by suggesting that an officer must consider the First Amendment activity affirmative defense because of its constitutional roots. It is not whether the defense is rooted in the constitution or statute that matters, but rather, whether the facts and circumstances giving rise to the defense are known to the arresting officer. It would be unreasonable to expect law enforcement officers to differentiate between defenses rooted in a constitution and other defenses.

Plaintiffs acknowledge that the First Amendment exception in two reported curfew cases is referred to as a "defense," see *Hutchins v. District of Columbia*, 188 F.3d 531, 534 (D.C.Cir.1999) (en banc); *Qutb v. Strauss*, 11 F.3d 488, 490 (5th Cir.1993), *cert. denied*, 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994); but argue these cases are distinguishable because the ordinances at issue specifically required the arresting officer to determine that no defense existed before making an arrest, see *Hutchins*, 188 F.3d at 535;[11] *Qutb*, 11 F.3d at 490–1.[12] Plaintiffs argue that where the burden of producing evidence justifying a defense is imposed on a defendant—as with affirmative defenses, *see Dockery v. State*, 644 N.E.2d 573, 577 (Ind. 1994), including the First Amendment activity defense—an officer cannot be required to rule out the existence of the defense in determining probable cause.

An officer need not rule out the First Amendment activity defense in every case. However, both federal and state law require an arresting officer to consider the totality of the circumstances in determining whether probable cause exists to make an arrest. *See, e.g., Rucker*, 138 F.3d at 700; *Baldwin*, 715 N.E.2d at 337. As a matter of fair construction of the statute, this court must presume that law enforcement officers will enforce the statute and Indiana courts will construe it in a constitutional manner, so that the totality of the circumstances will be considered. The totality of the circumstances may include facts and circumstances giving rise to the First Amendment activity defense. Thus,

in determining probable cause to arrest for a curfew violation, an officer may not ignore information known to him or her which conclusively establishes the First Amendment activity defense. So, the defense must be considered when the facts and circumstances conclusively establishing the defense are known to the arresting officer. Thus, it makes no difference whether the facts and circumstances establish an exception to a curfew law's applicability or whether they establish an affirmative defense. Either way, an officer considers all facts and circumstances known to him or her at the time of the arrest.

■ To be sure, an officer observing a child who appears to be under the age of 18 out walking during curfew hours does not have to investigate the child's assertion that he is returning from or going to a religious or political activity. So, children who appear to be under the age of 18 who are out during curfew hours walking to the Governor's residence to protest an early morning execution might be arrested. This is because the officer might have to investigate whether the children are in fact walking to the Governor's residence to the protest, and the officer is not required to undertake such an investigation in determining probable cause.[13] But this does not mean that the curfew law is facially unconstitutional. A statute is not facially invalid "merely because it is possible to conceive of a single impermissible application," *Broadrick v. Oklahoma*, 413 U.S. 601, 630, 93 S.Ct. 2908, 37 L.Ed.2d 830

---

**11.** Under the curfew: "If, after questioning an apparent offender to determine his age and reason for being in a public place, a police officer reasonably believes that an offense has occurred under the curfew law and that no defense exists, the minor will be detained by the police.... " *Id.*

**12.** Under the ordinance, an officer could make an arrest only if he or she reasonably believed that the person violated the ordinance and that no defenses applied. *Id.*

**13.** Of course, nothing prevents the officer from investigating the child's assertion of the First Amendment activity defense prior to making an arrest for a curfew violation.

(1973) (Brennan, J., dissenting), or even a few impermissible applications. Rather, to be facially overbroad a statute must reach "a substantial amount of constitutionally protected conduct." *City of Houston, Tex. v. Hill,* 482 U.S. 451, 459, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). Plaintiffs have offered nothing to suggest there is a substantial risk that officers would arrest minor children participating in, going to or returning from protected First Amendment activities. For example, an officer would not have probable cause to arrest children who appear to be under the age of 18 and who also appear to be participating in an early morning protest at the Governor's residence. Similarly, an officer would not have probable cause to arrest children apparently under the age of 18 attending Midnight Mass at the Cathedral. In those cases, the officer would have knowledge of facts and circumstances which would conclusively establish the First Amendment activity affirmative defense; the officer would not have to conduct any investigation into the defense as it would be readily apparent that the children were engaging in protected activity. Again, this court must start from the premise that the statute would be applied in this way because a fair reading allows for this interpretation.

In arguing that the threat of arrest under the new curfew law chills minors from participating in First Amendment activities and chills parents' willingness to allow such participation, Plaintiffs rely on *City of Houston, Tex. v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), and *Chicago Area Military Project v. Chicago,* 508 F.2d 921 (7th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975). These cases are distinguishable, however, as the threat of arrest in each was realistic and substantiated by evidence of actual arrest or actual warnings of arrest. In *Hill,* the plaintiff presented evidence of arrests for violation of the challenged ordinance, including the arrests of several reporters and his own experience of having been arrested four times for violating the ordinance. 482 U.S. at 455, 107 S.Ct. 2502. In *Steffel,* the petitioner was twice warned to stop distributing handbills at a shopping center in violation of a criminal trespass law, police told him that if he disobeyed the warning to stop he would likely be prosecuted, and his handbilling companion was prosecuted under the law he challenged. *Steffel,* 415 U.S. at 452, 459, 94 S.Ct. 1209. In *Chicago Area Military Project* the plaintiffs distributed their newspaper at an airport and were told by two police officers that leafletting was not permitted and they would be arrested if they persisted in distributing their newspaper. *Chicago Area Military Project,* 508 F.2d at 923. Plaintiffs also quote the following language from *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977): "[S]uch a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged." This language, however, was written in the context of explaining the reasoning behind the First Amendment overbreadth doctrine.

■ Plaintiffs have presented no evidence to show that the threat of arrest for minors exercising First Amendment rights during curfew hours is a realistic threat. Though the new curfew law had been in effect for several months at the time of the preliminary injunction hearing, Plaintiffs offered no evidence that any minors participating in First Amendment activities had been arrested for curfew violations or had been threatened with arrest by a police officer for such activities. Given that their challenge is facial in nature, the absence of proof on this is not surprising. But they also have failed to show that the only fair interpretation of that language results in

such a threat. Thus, Plaintiffs have not shown that the new curfew law burdens a substantial amount of minors' First Amendment conduct by subjecting them to arrest when they are out during curfew hours. The court agrees with *Hutchins* that the First Amendment defense "by definition provides full protection," *Hutchins v. District of Columbia*, 188 F.3d 531, 548 (D.C.Cir.1999) (en banc), to minors' First Amendment rights. Since Plaintiffs have not shown the new curfew law burdens a substantial amount of minors' First Amendment conduct, their facial overbreadth challenge fails. *See Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. 1186.

■■■ However, even assuming that the new curfew law burdens some of minors' First Amendment conduct, · Plaintiffs have not demonstrated that a substantial portion of that burden fails to serve to advance the government's legitimate interests. Plaintiffs seem to suggest that Defendants have offered no evidence that the governmental interests are advanced by the curfew law. But in contrast with *Hodgkins I*, Defendants herein have offered such evidence, namely the evidence incorporated from *Hodgkins II*. That evidence supports a finding that crime in general increases during the night. In *Qutb v. Strauss*, 11 F.3d 488 (5th Cir.1993), *cert. denied*, 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994), the court concluded that the city's statistical information regarding the juvenile crime rate and the increased likelihood of murder, aggravated assault, and rape during curfew hours demonstrated that the challenged curfew was narrowly tailored to serve the government's interest in increasing juvenile safety and decreasing juvenile crime, and, therefore satisfied strict scrutiny. *Id.* at 493–94. The court rejected the plaintiffs' argument that the government had to establish a problem with juvenile crime and victimization during curfew

hours. *Id.* at 493 n. 7; *see also Hutchins*, 188 F.3d at 543–44 (citing *Qutb* with approval). The evidence at this stage of the case is sufficient to establish that the curfew law serves to advance the government's legitimate interests in providing for the safety and well-being of its children and combating juvenile crime. Those interests would be achieved less effectively absent the curfew law. Without the curfew, more children would be out on the streets late at night and at risk of victimization. Though the curfew law may be less of a deterrent to those minors who are inclined to engage in criminal acts, the curfew nevertheless may serve to keep some of them off the streets, thus deterring juvenile crime.

■■■ Plaintiffs contend that even if the curfew law is narrowly tailored to serve the government's interests, it is unconstitutional because it does not leave open ample alternative channels of communication. This is so, they claim, since the law leaves no public fora in which a minor can exercise First Amendment rights during curfew hours without running the risk of being arrested and forced to prove his or her affirmative defenses at trial. "An adequate alternative does not have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech." *Gresham*, 225 F.3d at 906 (citations omitted). "[A]n alternative must be more than merely theoretically available. It must be realistic as well." *Id.* (citations omitted). Moreover, "an adequate alternative cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Id.* at 906–07 (citations omitted).

■■■ The court finds that the new curfew law satisfies the requirement that there be ample alternative channels for communication. First, the curfew law does not foreclose all public fora to chil-

dren during curfew hours. Quite the contrary. Given the First Amendment activity defense and religious events defense, minors may engage in protected communication in public during curfew hours.[14] In addition, minors may exercise their First Amendment rights in public during curfew hours provided they are accompanied by a parent, guardian or custodian, or an adult specified by a parent, guardian or custodian. Furthermore, minors may engage in protected expression from within the confines of their homes whether through, for example, the internet or the telephone. Moreover, the curfew leaves unaffected all forms of communication during non-curfew hours. Thus, minors of all ages may engage in protected expression in a public place at any time before 11 p.m. and after 5 a.m. For minors ages 15, 16 and 17, they also may engage in protected expression in a public place after 11 p.m. on Friday and Saturday and until 1 a.m. on Saturday and Sunday. The curfew law may not provide as many alternatives as did the panhandling ordinance upheld in *Gresham*, see 225 F.3d at 907 (finding adequate alternative channels of communication where panhandling ordinance allowed panhandling in any manner during the day and allowed non-vocal street panhandling, telephone and door-to-door solicitation at night). The alternative channels of communication that the curfew law leaves open to minors during curfew hours, however, are ample.

See *Nunez v. City of San Diego*, 963 F.Supp. 912, 920 (S.D.Cal.1995), *rev'd*, 114 F.3d 935 (9th Cir.1997).

The court finds that Indiana's new curfew law does not reach a substantial amount of minors' conduct protected by the First Amendment. Any burden on minors' First Amendment rights created by the threat of arrest under the new curfew law is incidental. Further, the new curfew law is narrowly tailored to serve the State's significant interests and leaves open ample alternative channels of communication. Accordingly, the court concludes that Plaintiffs have not shown some likelihood of success on the merits of their claim that Indiana's new curfew law violates minors' First Amendment rights.

## C. FOURTEENTH AMENDMENT CHALLENGE[15]

Plaintiffs claim the curfew law violates the fundamental rights of parents and legal guardians to raise and control their children without undue government interference. The parties have agreed to incorporate by reference their arguments made in support of and against the motion for preliminary injunction in *Hodgkins II*. Defendants contend that the new curfew is even less susceptible to a parental rights challenge because it contains several additional defenses that permit parents to exercise their rights to allow their children to be in public during curfew hours.[16]

---

**14.** The First Amendment activity defense and parental accompaniment defense also saves the curfew law from the concerns expressed in *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 462, —— L.Ed.2d —— (2001), over allowing government to control the access of children to information and opinion.

**15.** Pursuant to the parties' stipulation, they have incorporated by reference and repeat the arguments made in the briefs on this issue filed in *Hodgkins II*.

**16.** These are an emergency involving the protection of a person or property from an imminent threat of serious bodily injury or substantial damage; an activity protected under the First Amendment or Article 1, Section 31 of the Constitution of the State of Indiana, or both; a nonprofit or governmental entity activity providing recreation, education, training, or other care under the supervision of an adult; or interstate or international travel. *See* Ind.Code § 31–37–3–3.5.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." This "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (quotation and citation omitted) (four Justice plurality). As this court observed in *Hodgkins II*, the Supreme Court's most recent pronouncement on parental rights came in *Troxel* in the context of child visitation rights. The Court examined a Washington statute which allowed "any person" to file a petition to seek visitation rights with a child and authorized the state court to grant such visitation when in the best interest of the child. *Id.* at 67, 120 S.Ct. 2054. The plaintiffs were the paternal grandparents of two children whose mother and father never married. The grandparents had regular visits with the children, but after the children's father passed away, the mother sought to restrict the grandparents' visits with the children. The grandparents brought an action against the mother seeking visitation rights under the Washington statute. *Id.* at 60–61, 120 S.Ct. 2054. The mother's fitness as a parent was not at issue. *Id.* at 68, 120 S.Ct. 2054. The Court reiterated that "[t]he liberty interest ... of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65, 120 S.Ct. 2054. The Court held that the statute as applied unconstitutionally infringed on the mother's fundamental due process right to make decisions concerning the care, custody, and control of her children. *Id.* at 66–67, 72–73, 75, 120 S.Ct. 2054.

The *Troxel* Court relied on "extensive precedent," including *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and other cases recognizing parental rights. In *Meyer,* the Court held unconstitutional a state statute prohibiting the teaching of subjects in any language other than English because it deprived teachers and parents of liberty guaranteed by the Fourteenth Amendment. *See Meyer,* 262 U.S. at 396–97, 399–400, 43 S.Ct. 625. In discussing the liberty protected by the Fourteenth Amendment, the Supreme Court said, "Without doubt, it denotes ... the right of the individual ... to ... establish a home and bring up children...." *Id.* at 399, 43 S.Ct. 625. That right includes, the Court said, "the power of parents to control the education of their own." *Id.* at 401, 43 S.Ct. 625. The Court indicated that this liberty interest may not be interfered with by a law without "reasonable relation" to a state purpose. *See Meyer,* 262 U.S. at 399–400, 43 S.Ct. 625.

Two years later, in *Pierce,* the Supreme Court held unconstitutional a state statute compelling the attendance of children between 8 and 16 years of age at public schools. *See Pierce,* 268 U.S. at 530, 45 S.Ct. 571. Applying *Meyer,* the Court concluded that the statute "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce,* 268 U.S. at 534–535, 45 S.Ct. 571. The Court explained that a "child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535, 45 S.Ct. 571. In striking down the statute, the Court required a "reasonable relation" between laws abridging constitutional rights and

some government purpose. *See id.* at 535, 45 S.Ct. 571.

In upholding a child labor law prohibiting minors from selling magazines in streets or public places, the Supreme Court in *Prince* again recognized that parents have a right to direct the upbringing of their children. *See Prince,* 321 U.S. at 165–66, 64 S.Ct. 438. The Court stated: "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 166, 64 S.Ct. 438 (citing *Pierce* ). The Court added that "it is in recognition of this that [the Court's decisions] have respected the private realm of family life which the state cannot enter." *Id.* However, the *Prince* Court recognized that the "rights of parenthood are [not] beyond limitation," *id.,* and said:

> Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience.

*Prince,* 321 U.S. at 166, 64 S.Ct. 438 (footnotes omitted). The Court noted, for example, that the state can compel child vaccinations. *See id.* The Court concluded that "the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare...." *Id.* at 167, 64 S.Ct. 438.

In *Yoder,* the Supreme Court held that a statute requiring children to attend school until the age of sixteen was unconstitutional as applied to the Amish. *See Yoder,* 406 U.S. at 234–35, 92 S.Ct. 1526. *Yoder* was decided under the Free Exercise Clause of the First Amendment; however, the hold-ing was based in part on the "interests of parents." *Id.* at 232–33, 92 S.Ct. 1526. The Court noted that the parents' right to guide their children's religious upbringing and education has "a high place in our society." *Id.* at 213–214, 92 S.Ct. 1526.

Other Supreme Court decisions have recognized that certain parental rights are fundamental liberty interests, though the holdings were not based on parental rights. *See, e.g., Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (upholding statute banning assisted suicides; "[T]he 'liberty' specially protected by the Due Process Clause includes the right[ ] ... to direct the education and upbringing of one's children."); *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (parental rights termination proceeding; "Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.") (quotations omitted); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights; "The fundamental liberty interest of natural parents in the care, custody, and management of their child."); *Bellotti v. Baird,* 443 U.S. 622, 638, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (action challenging statute regulating minors' access to abortions; "deeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children"); *Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (action challenging laws allowing voluntary admission of minor children to mental hospitals by parent or guardian; "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental au-

thority over minor children. Our cases have consistently followed that course."); *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (action challenging adoption statutes; "We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Smith v. Org. of Foster Families*, 431 U.S. 816, 842–844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (action challenging state procedures for removal of foster children from foster parents' homes; recognizing that a private realm of family life has been afforded substantive due process protections); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 708, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (Powell, J., concurring) (action challenging statute regulating provision of contraceptives to minors; noting that the statute "prohibits parents from distributing contraceptives to their children, a restriction that unjustifiably interferes with parental interests in rearing their children"); *Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion) (holding ordinance limiting occupancy of a dwelling to members of a single family with a limited definition of "family" violated due process; recognizing a "host of cases" that "have consistently" acknowledged a "private realm of family life which the state cannot enter."); *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (holding state statute prohibiting abortions at any stage of pregnancy unconstitutional; fundamental rights to privacy has "some extension" to activities relating to, *inter alia*, marriage, family relationships, and child rearing and education); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (holding unconstitutional statute that automatically allowed state to assume custody of illegitimate child upon death of mother without allowing father to assert parental rights; "It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely fro@m shifting economic arrangements.' ") (citation omitted); *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (upholding statute prohibiting sale of obscene materials to minors; "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.").

█ Given such precedent, the *Troxel* Court concluded: "[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66, 120 S.Ct. 2054 (four Justice plurality). Four other Justices agreed. *See id.* at 77, 120 S.Ct. 2054 (Souter, J., concurring) ("We have long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause . . . ."); *id.* at 80, 120 S.Ct. 2054 (Thomas, J., concurring) ("parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them"); *id.* at 87, 120 S.Ct. 2054 (Stevens, J., dissenting) ("Our cases leave no doubt that parents have a fundamental liberty interest in caring for and guiding their children, and a corresponding privacy interest—absent exceptional circumstances—in doing so without the undue interference of strangers to them and to their child."); *id.* at 95, 120 S.Ct. 2054 (Kennedy, J., dissenting) ("the custodial parent has a constitutional right to determine, without undue interference by the

state, how best to raise, nurture, and educate the child.").

The *Troxel* plurality, however, evoked disagreement from the other Justices regarding the scope of fundamental parental rights. Justice Souter recognized that parental rights "in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment." *See Troxel,* 530 U.S. at 77, 120 S.Ct. 2054 (Souter, J., concurring). He emphasized, however, that the Court has not defined the breadth of parental rights: "Our cases, it is true, have not set out exact metes and bounds to the protected interest of a parent in the relationship with his child. . . ." *Id.* at 78, 120 S.Ct. 2054. Justice Stevens noted that parental liberty interests "have never been seen to be without limits," *id.* at 87, 120 S.Ct. 2054 (Stevens, J., dissenting), and are subject to state interference in "exceptional circumstances." *Id.* Highly critical of the plurality's extension of the theory of parental rights, Justice Scalia stated:

> Only three holdings of this Court rest in whole or in part upon a substantive constitutional right of parents to direct the upbringing of their children—two of them from an era rich in substantive due process holdings that have since been repudiated. [citing *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ]. The sheer diversity of today's opinions persuades me that the theory of unenumerated parental rights underlying these three cases has small claim to stare decisis protection. . . . While I would not now overrule those earlier cases (that has not been urged), neither would I extend the theory upon which they rested to this new context.

*Troxel,* 530 U.S. at 92, 120 S.Ct. 2054 (Scalia, J., dissenting) (footnoted omitted).

Justice Scalia predicted that by embracing parental rights, the Supreme Court "will be ushering in a new regime of judicially prescribed, and federally prescribed, family law. I have no reason to believe that federal judges will be better at this than state legislatures. . . ." *Id.* at 93, 120 S.Ct. 2054 (Scalia, J., dissenting). And, finally, Justice Kennedy joined in the concern over the expansion of fundamental parental rights, writing, "The principle exists, then, in broad formulation; yet courts must use considerable restraint, including careful adherence to the incremental instruction given by the precise facts of particular cases, as they seek to give further and more precise definition to the right." *Id.* at 95–96, 120 S.Ct. 2054 (Kennedy, J., dissenting).

These Justices' concern over the breadth of the fundamental parental rights implied by the *Troxel* plurality opinion has support in Supreme Court precedent. As the Court noted less than ten years ago, "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended." *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (citation omitted) (holding due process does not require municipalities to provide certain minimal levels of safety and security in the workplace and city's failure to train or warn employees of known hazards did not violate substantive due process rights of employee). The Court repeatedly has instructed lower courts that " '[s]ubstantive due process' " analysis must begin with a careful description of the asserted right, for " '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' " *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (quot-

ing *Collins*, 503 U.S. at 125, 112 S.Ct. 1061) (holding federal regulation providing for release of alien juveniles only to parents, close relatives or legal guardians, except in unusual and compelling circumstances, did not violate juveniles' substantive due process rights); *see also Washington v. Glucksberg*, 521 U.S. 702, 721–22, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (holding no substantive due process right to assisted suicide); *Bowers v. Hardwick*, 478 U.S. 186, 194–95, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (holding Georgia statute criminalizing sodomy did not violate homosexual's fundamental rights).

As the court determined in *Hodgkins II*, *Flores*, *Glucksberg* and *Bowers* exemplify the precision with which the Supreme Court has described the asserted right when a substantive due process claim is raised. In *Glucksberg*, the Court rejected the following formulations of the asserted right: "a liberty interest in determining the time and manner of one's death," the "right to die," the liberty "to choose how to die," the "right to control of one's final days," "the right to choose a humane, dignified death," and "the liberty to shape death." *Glucksberg*, 521 U.S. at 722, 117 S.Ct. 2258 (quotations omitted). The Court stated that the claimed right was the "right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 723, 117 S.Ct. 2258.[17] The *Flores* Court rejected the respondents' argument that the right at issue was the "freedom from physical restraint," *Reno*, 507 U.S. at 302, 113 S.Ct. 1439, and added that the right was not the "right to come and go at will...." *Id.* Instead, the Court described the right asserted as "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom

the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* Similarly, the *Bowers* majority narrowly described the right asserted as whether homosexuals have a fundamental constitutional right "to engage in sodomy," 478 U.S. at 190, 106 S.Ct. 2841; *see also id.* at 191, 106 S.Ct. 2841; rather than "the right to be let alone," *see Bowers*, 478 U.S. at 199, 106 S.Ct. 2841 (Blackmun, J., dissenting), advocated by the dissent. Chief Justice Burger wrote separately in order "to underscore [his] view that in constitutional terms there is no such thing as a fundamental right to commit homosexual sodomy." *Bowers*, 478 U.S. at 196, 106 S.Ct. 2841 (Burger, C.J., concurring).

"It is important ... to focus on the allegations in the complaint to determine how [the plaintiffs] describe[ ] the constitutional right at stake...." *Collins*, 503 U.S. at 125, 112 S.Ct. 1061. A careful formulation of the interest at stake allows the court to determine whether the right asserted comes within the scope of a fundamental right recognized by the Supreme Court. Nancy Hodgkins argues that the curfew law unlawfully impinges on the substantive due process right of parents to make decisions regarding the care, custody and control of their children. More specifically, she complains that the curfew law impinges on parents' fundamental rights because it penalizes the activities of children who are out after curfew even with parental permission or at parental direction. (Mem. Supp. Mot. Prelim. Inj. at 6; *see also* Compl. ¶¶ 33, 43.) Thus, the right may be described as the right of parents to allow their minor children to be

---

**17.** Similarly, in *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), the Supreme Court described the right asserted as the "right to refuse life-saving hydration and nutrition," *id.* at 279, 110 S.Ct. 2841, rather than the "right to die".

in public with parental permission during curfew hours. (*See* Compl. ¶ 36; *see also id.* at ¶¶ 33, 34; Pls.' Proposed Findings Fact & Conclusions Law ¶¶ 7, 40.)

Though the Supreme Court has not examined parental rights in the context of a nocturnal juvenile curfew law, decisions from several lower federal courts have. *See Hutchins v. District of Columbia,* 188 F.3d 531 (D.C.Cir.1999) (en banc); *Schleifer v. City of Charlottesville,* 159 F.3d 843, 853 (4th Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999); *Nunez v. City of San Diego,* 114 F.3d 935 (9th Cir.1997); *Qutb v. Strauss,* 11 F.3d 488 (5th Cir.1993), *cert. denied,* 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994); *Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981); *Ramos ex rel. Ramos v. Town of Vernon,* 48 F.Supp.2d 176, 185 (D.Conn.1999); *McCollester v. City of Keene,* 586 F.Supp. 1381 (D.N.H.1984); *Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242 (M.D.Pa.), *aff'd,* 535 F.2d 1245 (3rd Cir.1975), *cert. denied,* 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976).[18] None was decided after *Troxel.*

The Ninth and Fifth Circuits along with two district courts have held that curfew laws implicated parents' fundamental due process rights. *See Nunez,* 114 F.3d at 951–51; *Qutb,* 11 F.3d at 495–96; *McCollester,* 586 F.Supp. at 1386; *Bykofsky,* 401 F.Supp. at 1262–63. The Fifth Circuit was the first circuit to address parental rights in the curfew context when in *Qutb* it recognized parents' fundamental due process right to rear their children without undue government interference, citing *Ginsberg. See Qutb,* 11 F.3d at 495. The court then determined that "the only aspect of parenting that this ordinance bears upon is the parents' right to allow the minor to remain in public places, unaccompanied by a parent or guardian or other authorized person, during the hours restricted by the curfew ordinance." *Id.* at 495–96. The court reasoned, based on the broad exemptions included in the ordinance, that parents retained the right to make decisions regarding their children in "all other areas." *Id.* at 496.[19] It therefore held that the ordinance did not impermissibly impinge on parental rights. *Id.*[20]

---

18. *Johnson* has little bearing on the issues before this court because the curfew ordinance was held to violate the constitutional rights of minors due to its over breadth. *See Johnson,* 658 F.2d at 1073–74. However, in discussing the justification for greater restrictions on the constitutional rights of children than adults, see *Bellotti v. Baird,* 443 U.S. 622, 634, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), the court noted that by removing from parents the decision of whether children should engage in associational activities during curfew hours, the ordinance inhibited the parents' rights in child-rearing. *See Johnson,* 658 F.2d at 1074. In *Naprstek v. City of Norwich,* 545 F.2d 815 (2d Cir.1976), parents asserted that a juvenile curfew law impermissibly infringed their due process rights to family privacy. The court, however, did not address that argument. Rather, it found the law unconstitutionally vague as it did not specify the time each day at which the curfew ended. *See id.* at 818. Thus, *Naprstek* is of no assistance to the court in deciding the issues before it.

19. The ordinance challenged in *Qutb* applied to persons under 17 and contained the following exceptions: (1) minors accompanied by parent or guardian; (2) minors on an errand for a parent or guardian; (3) minors in motor vehicles traveling to or from a place of employment or involved in employment related activities; (4) minors attending school, religious or civic organization functions or general exercise of First Amendment speech and associational rights; (5) minors engaged in interstate travel; (6) minors on the sidewalk in front of the minor's home or that of a neighbor; and (7) in case of an emergency. *See id.* at 490.

20. One judge concurred in the result, but expressed no view on the majority's reasoning. *See id.* at 496 (King, J., concurring in result).

Subsequently, in *Nunez*, the Ninth Circuit relied upon *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and held that a curfew ordinance violated the parents' substantive due process rights to rear their children without undue government interference. *See Nunez*, 114 F.3d at 951–52. The court explained that the ordinance lacked an exception for specific activities pre-approved by parents.[21] The court concluded that because of this, "parents could not allow their children to function independently at night, which some parents may believe is part of the process of growing up." *Nunez*, 114 F.3d at 952 (citing *Qutb*, 11 F.3d at 496). The Ninth Circuit held that the ordinance was not narrowly tailored to further the government's compelling interest in the health, safety and welfare of minors. *See id.*

The *Bykofsky* court recognized that "[t]he Constitution protects the right of parents to direct their children's upbringing and family autonomy against state interference." *Bykofsky*, 401 F.Supp. at 1262. It noted that "the right of the parent to direct the upbringing of his children and the right to family autonomy are not absolute." *Id.* The court then held that the curfew ordinance did not impermissibly impinge on the parents' rights to direct the upbringing of their children. *See id.* at 1264. It relied on the numerous exceptions to the ordinance, including accompaniment by a parent, in stating that the interference with parental rights in influencing and controlling their children was "minimal." *Id.*[22] Further, the court stated

---

**21.** The ordinance at issue in *Nunez* applied to minors under the age of 18 but did not apply when the minor was (1) accompanied by a parent, guardian, or other adult having the care and custody of the minor; (2) on an emergency errand directed by parent, guardian, or other adult having the care and custody of the minor; (3) returning directly home from a meeting, entertainment or recreational activity directed, supervised, or sponsored by local educational authorities; or (4) engaged in legitimate employment. *See Nunez*, 114 F.3d at 938–39.

**22.** The *Bykofsky* curfew ordinance, which applied to minors under the age of 18, contained the following exceptions: "(a) The minor is accompanied by a parent (defined to include a legal guardian, a person who stands in loco parentis, or a person to whom legal custody has been given by court order); (b) The minor is accompanied by an adult authorized by the parent to take the parent's place in accompanying the minor for a designated period of time and specific purpose within a specified area; (c) The minor is exercising first amendment rights protected by the Constitution, such as free exercise of religion, freedom of speech, and the right of assembly ...; (d) In a case of reasonable necessity but only after the minor's parent has communicated to the Middle town police station personnel 'the facts establishing such reasonable necessity

...; (e) The minor is on the sidewalk of his residence, or on the sidewalk of either next-door neighbor, so long as the neighbor does not object to the minor's presence on his sidewalk; (f) The minor is returning home by a direct route from, and within thirty minutes of the termination of, a school activity or an activity of a religious or other voluntary association, provided prior notice of said activity and the place and probable time of termination has been given in writing to the Chief of Police or the officer assigned by him on duty at the police station; (g) The minor has been authorized, by special permit obtained from the Mayor, to be on the streets during the curfew hours for normal or necessary nighttime activities inadequately provided for by other exceptions in the ordinance; (h) The minor is a member of a group of minors permitted by a 'regulation' issued by the Mayor to be on the streets during the curfew hours for normal or necessary nighttime activities inadequately provided for by other exceptions in the ordinance, there being too many persons involved for use of the individualized permit procedure of exception (g) above; (i) The minor carries a certified card of employment; (j) The minor is in a motor vehicle with parental consent for normal travel, with interstate travel through Middletown excepted in all cases from the curfew; (k) A minor is seventeen years of age and is except-

that "[t]he ordinance does not dictate to the parent an over-all plan of discipline for the minor." *Bykofsky*, 401 F.Supp. at 1264. The court found that the ordinance furthered several important governmental interests, including keeping juveniles off the streets without adult supervision during the nighttime hours and imposing a duty on parents to know the whereabouts and activities of their children at night. *Id.* The court concluded that these interests outweighed the parents' interest in the upbringing of their children, which was only minimally infringed. *See id.*

In contrast with *Bykofsky*, the district court in *McCollester* held that the curfew ordinance at issue impermissibly impinged the parents' liberty and privacy interests in family and childbearing. *See McCollester*, 586 F.Supp. at 1386.[23] In doing so, the court relied on the line of Supreme Court cases including *Yoder*, *Prince* and *Ginsberg* suggesting a parental right against undue state interference. *See id.* The court concluded that the curfew ordinance "usurp[ed] parental discretion in supervising a child's activities ... even where the parent exercised reasonable control or supervision...." *Id.*

The District of Columbia Circuit and the Fourth Circuit along with a district court, on the other hand, have held that curfew laws did not implicate a parent's substantive due process rights. *See Hutchins*, 188 F.3d at 540; *Schleifer*, 159 F.3d at 853; *Ramos*, 48 F.Supp.2d at 187. The *Hutchins* plaintiffs claimed that parents have a fundamental right to direct and control their children's upbringing and that this right was impinged by the curfew law. *See Hutchins*, 188 F.3d at 540.[24] Though the court agreed that parents have such a fundamental right, a four-judge plurality determined that the curfew did not implicate that right. *See id.* The plurality reasoned, based on *Meyer*, *Pierce* and *Yoder*, that the parents' fundamental right in the upbringing of their children "is focused on the parents' control of the home and the parents' interest in controlling ... the formal education of children." *Hutchins*, 188 F.3d at 540–41. The plurality concluded that a parent's right to determine whether and when children will be on the streets was not among the "intimate family decisions" encompassed by fundamental parental rights. *See id.* at 541. Thus, the *Hutchins* plurality concluded that the pa-

---

ed from the curfew by 'formal rule' promulgated by the Mayor excepting designated minors, minors in a defined group or area, or all minors seventeen years of age." *Id.* at 1246–47.

23. The ordinance in *McCollester* prohibited juveniles under 16 from being on public streets or any public place from 10 p.m. until 5 a.m. The ordinance excepted juveniles: (1) accompanied by a parent, legal guardian, or person over 18 authorized by the parent or guardian; (2) in transit to or from employment; (3) in transit between 10 p.m. and midnight to or from a restaurant, library, movie theater, store, or other place of public accommodation; and (4) in transit between 10 p.m. and midnight to or from a church, meeting hall, school, courthouse, or other place of public worship or assembly. *See McCollester*, 586 F.Supp. at 1383.

24. The curfew considered in *Hutchins* contained eight defenses which were that the minor was: (1) accompanied by a parent, guardian, or adult authorized by the parent to be a caretaker for the minor; (2) on an errand for the parent, guardian or authorized caretaker; (3) in a vehicle involved in interstate commerce; (4) engaged in employment activity; (5) involved in an emergency; (6) on the sidewalk abutting the minor's residence or next-door-neighbor's residence, provided the neighbor had not complained to police; (7) in attendance at an official school, religious, or other recreational activity sponsored by the District of Columbia, a civic organization, or other similar entity taking responsibility for the minor; and (8) exercising First Amendment rights. Travel to and from such activities recognized as defenses to the curfew also was included in the defenses. *See Hutchins*, 188 F.3d at 545.

rental right asserted by the plaintiffs did not come within the scope of those rights which the Supreme Court has recognized as fundamental parental rights.

The other seven judges on the court were of the opinion that the curfew did implicate the parents' substantive due process rights. *See Hutchins,* 188 F.3d at 543 (noting that Judges Wald, Ginsburg, Henderson and Garland join in Parts I, III and IV of the opinion), 541 (assuming that the curfew implicated the fundamental rights of the children and their parents); *id.* at 549–50 (Edwards, C.J., concurring in part and concurring in result); *id.* at 552 (Wald, J., concurring) (concluding curfew implicates the constitutional rights of the parents); *id.* at 571–72 (Tatel, J., dissenting) (concluding curfew infringes parent's fundamental right to control the upbringing of their children). Relying on *Prince, Yoder, Pierce, Stanley* and *Ginsberg,* Chief Judge Edwards concluded that the Supreme Court had not limited parental rights to activities "literally inside the home or literally inside the classroom." *Id.* at 550. He stated that such à limitation disregarded Supreme Court precedent and was "implausible." *Id.* (recognizing the "Supreme Court's admonition in *Yoder* that the 'primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.' ") (quoting *Yoder,* 406 U.S. at 232, 92 S.Ct. 1526).

In *Schleifer,* the plaintiffs claimed that a city curfew ordinance violated the parents' constitutional rights to direct their children's upbringing without undue government interference, including the right to decide whether to allow their children to engage in activities during curfew hours. *See Schleifer,* 159 F.3d at 852. The plaintiffs argued the ordinance interfered with that right because it prohibited children's activities that had the parents' approval but did not fall under one of the ordinance's eight exceptions.[25] The Fourth Circuit held that the ordinance did not implicate "the kinds of intimate family decisions" such as a parent's custodial rights or authority to direct a child's education, which the Supreme Court has recognized as fundamental, citing *Yoder, Stanley,* and *Meyer. See Schleifer,* 159 F.3d at 853. The court expressed concern that acceptance of the plaintiffs' argument would lead to artful pleading in the future:

> litigants could simply artfully plead violations of parental rights to avoid the Supreme Court's determination that children do not possess all the freedoms of adults. Arguments based on minors' rights to engage in particular conduct would be routinely recast as arguments based on parents' rights to allow their children to engage in precisely the same conduct.

*Id.* at 852. Furthermore, the court stated that several of the ordinance's exceptions accommodated the parents' rights, including the accompaniment and errand exceptions. *See id.* at 853. It concluded, based on the limited scope of the curfew and its exceptions, that the ordinance satisfied even strict scrutiny. *See id.* at 851, 853.

One judge dissented from the *Schleifer* majority, emphasizing the Supreme Court's "deference to the traditional authority of parents over the activities of their children." *Schleifer,* 159 F.3d at 862

---

**25.** The ordinance considered by the *Schleifer* court prohibited persons under seventeen from remaining in a public place, motor vehicle, or establishment during curfew hours. It contained eight exceptions: (1) parental accompaniment; (2) parental errand; (3) employment; (4) attendance at supervised activities sponsored by school, civic, religious, or other public organizations; (5) interstate travel; (6) sidewalks abutting the minor's parents' residence; (7) emergencies; and (8) exercise of First Amendment rights. *See* 159 F.3d at 846.

(Michael, J., dissenting). In that judge's view, the ordinance was not designed to be supportive of parental rights, but rather displaced the exercise of parental discretion. *See id.* at 867–68. The judge therefore concluded that the curfew neither supported a compelling state interest in fostering and strengthening parental responsibility nor served the compelling state interest of promoting the safety and well-being of minors. *See id.* at 867–68.

The *Ramos* court held that the parents' liberty interests were not unconstitutionally infringed by the curfew ordinance. The court first observed that the Supreme Court had yet to clearly define the limits of a state's ability to interfere with the parents' rights to raise their children as they see fit. *See Ramos,* 48 F.Supp.2d at 187. Because the ordinance permitted minors to engage in any activity during curfew hours if accompanied by a parent and allowed minors to perform specific errands if permitted by a parent,[26] the court determined that the plaintiffs claimed a constitutional right "to allow their children to be on the streets and in public places at all hours of the night without any adult supervision." *Id.* The court reasoned, citing *Yoder* and *Meyer,* that this type of parental authority did not rise to the level with which the Supreme Court held the states may not interfere. *See id.* The *Ramos* court therefore held the ordinance did not unconstitutionally infringe the parents' rights. *Id.*

▮ As noted, none of the federal decisions involving parental rights in the curfew context were decided with the benefit of the opinions in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). One might question whether the

*Hutchins, Schleifer,* and *Ramos* courts would reach the same decisions in light of the sweeping language in *Troxel's* plurality opinion stating that "[t]he liberty interest ... of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054 (quotation and citation omitted). And, as this court has observed, four out of the other five Justices apparently agree that such a fundamental right exists, *see id.* at 77, 120 S.Ct. 2054 (Souter, J., concurring); *id.* at 80, 120 S.Ct. 2054 (Thomas, J., concurring); *id.* at 86–87, 120 S.Ct. 2054 (Stevens, J., dissenting); *id.* at 95, 120 S.Ct. 2054 (Kennedy, J., dissenting). However, after a careful study of *Troxel* and the earlier Supreme Court parental rights cases such as *Meyer, Pierce, Yoder,* and the other cases cited by the *Troxel* plurality, *see Troxel,* 530 U.S. at 66, 120 S.Ct. 2054, the court concludes that Plaintiff has not made a clear showing that the fundamental parental right extends to the right asserted in the instant case: a parent's right to allow his or her minor children to be in public with parental permission during curfew hours.

First and foremost, the nature of the parental rights that the Supreme Court has recognized as fundamental is quite important. The parental right asserted in *Troxel* was the mother's right to control the persons with whom her children associated and consequently, the persons who would have influence over them. Subsumed within that right is the right to limit visitation with her children by others. *See Troxel,* 530 U.S. at 73, 120 S.Ct. 2054 ("We do not, and need not define today the precise scope of the parental due process

---

**26.** The ordinance, which was applicable to minors under 18 years of age, also excepted minors engaged in specific business or activity directed or permitted by a parent, guardian, or other adult having the care and custody of the minor; minors engaged in legitimate employment; and minors exercising First Amendment rights. *Ramos,* 48 F.Supp.2d at 179.

right in the visitation context."). As Justice Souter observes:

> *Meyer's* repeatedly recognized right of upbringing would be a sham if it failed to encompass the right to be free of judicially compelled visitation by "any party" at "any time" a judge believed he "could make a 'better' decision" than the objecting parent had done. The strength of a parent's interest in controlling a child's associates is as obvious as the influence of personal associations on the development of the child's social and moral character. Whether for good or for ill, adults not only influence but may indoctrinate children, and a choice about a child's social companions is not essentially different from the designation of the adults who will influence the child in school.

*Troxel,* 530 U.S. at 78, 120 S.Ct. 2054 (Souter, J., concurring).

The parental rights asserted in the instant case and the parental rights recognized as fundamental by the Supreme Court are qualitatively different. The fundamental parental rights recognized in *Meyer* (education), *Pierce* (education and religion), *Prince* (religion), *Yoder* (education and religion) and *Troxel* (associations) are of a higher quality than that claimed by Plaintiff in the instant case. So, too, are the parental rights recognized as fundamental in a host of other Supreme Court cases. *See, e.g., M.L.B. v. S.L.J.,* 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (termination of parental rights); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (same); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (adoption); *Smith v. Org. of Foster Families,* 431 U.S. 816, 842–844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (removal of foster children from foster homes); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (child custody rights). Thus, Plaintiffs have not persuaded the court that the parental rights at stake in this case compare favorably to those at stake in the Supreme Court cases and are, therefore, worthy of the same level of protection.

Further support for the conclusion that parents have no fundamental right to allow their minor children to be in public places with parental permission during curfew hours may be found in the Supreme Court's decision of *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Though the substantive due process analysis was undertaken in a different context (striking down as unconstitutional sections of an abortion statute), the Court's observations have equal bearing here:

> Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. *Carey v. Population Services International,* [431 U.S. 678], 685, 97 S.Ct. at 2016 [1977].... Our precedents "have respected *the private realm of family life* which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). These matters, involving *the most intimate and personal choices a person may make in a lifetime,* choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

*Id.* at 851, 112 S.Ct. 2791 (emphasis added); *see also id.* at 926–27, 112 S.Ct. 2791 (Blackmun, J., concurring/dissenting)

("[T]he fundamental right of privacy protects citizens against governmental intrusion in such *intimate family matters* as procreation, childrearing, marriage, and contraceptive choice. These cases embody the principle that *personal decisions that profoundly affect bodily integrity, identity, and destiny should be largely beyond the reach of government.*") (Emphasis added).

Plaintiff still has not persuaded the court that the decision of a parent whether to allow his or her minor child to be in a public place during curfew hours is an intimate family matter that fundamentally affects a person. *See Hutchins,* 188 F.3d at 541; *Schleifer,* 159 F.3d at 853; *Ramos,* 48 F.Supp.2d at 187. This decision simply is not of an intimate and personal nature. It is not central to personal dignity and autonomy. It does not define the attributes of personhood, the concept of existence, of meaning, of the universe, or the mystery of human life. Plaintiff has not carried her burden of showing that this type of decision falls within the ambit of fundamental parental rights recognized by the Supreme Court.[27]

Moreover, recognition of a fundamental right in the instant case would be contrary to common sense and sound judgment. To be sure, a limitation of fundamental parental rights solely to the parents' home and a child's formal education is much too restrictive. On this point the undersigned disagrees with the *Hutchins* plurality. But the expansive definition of fundamental parental rights sought by Plaintiffs fails to allow sufficient consideration for the government's (sometimes competing) interest in the welfare of its children. Further, recognition of a fundamental right in this context would embroil the federal courts in family law and family matters traditionally left to the states. And, as the *Schleifer* court noted, recognition of a fundamental parental right in this context would create a significant risk of artful pleading in the future. It would be far too easy for plaintiffs to assert "parental rights" in order to elevate the rights of children to the same status of those of adults,[28] yet children's constitutional rights are not always coextensive with those of adults, *see, e.g., Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e.,* the right to come and go at will."); *Bellotti v. Baird,* 443 U.S. 622, 634, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) ("the constitutional rights of children cannot be equated with those of adults"); *Joy v. Penn Harris–Madison Sch. Corp.,* 212 F.3d 1052, 1063 (7th Cir.2000) ("Public high school students have a lesser expectation of privacy than the general public.").

The court concludes that the right of a parent to allow his or her minor children to be in public with parental permission during curfew hours is not a fundamental right. That decision made, the court must

27. As this court acknowledged in *Hodgkins II,* the mere fact that the Supreme Court has not yet decided whether parents have a fundamental right to allow their minor children to be in public places during curfew hours does not by itself constrain this court from doing so. The undersigned, however, does not believe that, if faced with such a claim, the Supreme Court would recognize the claimed right as a fundamental right.

28. For example, it could be argued that a parent has the right to determine the age at which his or her child may smoke, consume alcohol, drive a motor vehicle or quit school. The government clearly has the right to regulate the ages at which children may conduct these types of activities.

determine what level of judicial scrutiny is the most appropriate in this case.

■■■■ When neither a fundamental right nor a suspect class is involved, courts generally review legislation with the lowest level of judicial scrutiny.[29] Thus, a law is upheld if it is rationally related to a legitimate government interest. *See, e.g., Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997); *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Zehner v. Trigg,* 133 F.3d 459, 463 (7th Cir.1997). Plaintiffs do not dispute that protecting youth and assisting law enforcement and parents in protecting youth are laudable goals and, inferentially, legitimate government interests. No reasonable person could dispute that the government has a legitimate interest in protecting youth from victimization, drug and alcohol abuse, sexually transmitted diseases and in protecting the community from crimes committed by youth. This judge has no doubt that the curfew law is rationally related to those interests.

■■■■ But there is good reason to doubt that the lowest level of review is the most appropriate in the context of a juvenile curfew law. The rationale for a heightened level of review is that the parental right at stake, though not fundamental, is indeed significant. Parents, guardians, the children and the government all have important interests at stake: The children have a liberty interest, and the government has an interest in the welfare of its children. A heightened level of review of intermediate scrutiny balances the often competing interests of parents, their children, and the government. *See Hutchins,* 188 F.3d at 541; *Schleifer,* 159 F.3d at 847.

■■■■ A law survives intermediate scrutiny if it is "substantially related" to an "important" government interest. *See Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988); *see also Hutchins,* 188 F.3d at 545; *Schleifer,* 159 F.3d at 847. In considering the curfew law, the court is mindful that the "rights of parenthood are [not] beyond limitation." *Prince,* 321 U.S. at 166, 64 S.Ct. 438. "The state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction." *Prince,* 321 U.S. at 167, 64 S.Ct. 438. As the Supreme Court has said: "To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Yoder,* 406 U.S. at 233–34, 92 S.Ct. 1526.

■■■■ The court concludes that Plaintiff has not made a clear showing at this stage that the new curfew law fails to survive review at the intermediate level of scrutiny. The curfew law seems to be substantially related to the government's interests of protecting its youth from victimization and protecting others from crimes committed by youth during curfew hours. These interests are indeed important government interests; Plaintiffs have not argued otherwise. The evidence supports a finding that crime increases at night and that minors therefore are most vulnerable to victimization at night. (*See* Aff. of Jeffrey S. Decker ¶ 14 ("the nocturnal curfew hours are some of the busiest hours for IPD [Indianapolis Police Department] in terms of addressing and dealing with criminal of-

---

**29.** Age is not a suspect class. *See Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 83, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

fenses generally, the curfew hours are, in my experience, the most dangerous hours for juveniles to be out ... without adult supervision"); Aff. of Timothy J. Motsinger ¶ 20 ("during the nocturnal [curfew] hours ... young people were the most vulnerable to and at risk of victimization"); Aff. of Richard Witmer ¶ 7 (stating that the busiest hours for the Beech Grove Police Department "were between the hours of 6 p.m. to 6 a.m. and, therefore, were potentially dangerous hours for juveniles because of lack of adult supervision"); Aff. of Brian Toepp ¶ 6 ("The community is also at risk due to the fact that those children who are in the community during the 'curfew' time ... have a high risk of becoming victims....")). Plaintiffs argue, correctly, that the evidence does not directly establish that juvenile crime rates increase at night or whether only the overall crime rates increase at night.[30] Such a level of specificity, however, is not necessary at this preliminary injunction stage. One could reasonably infer that juvenile crime rates, like the overall crime rates, increase at night. But even if juvenile crime rates don't increase at night, it seems obvious that because crime generally increases at night, juveniles, like all other persons, are more likely to be victimized during the night.

■ Some parents, like Ms. Hodgkins, may disagree that the law empowers them to set and enforce limits on their children's nighttime and early morning activities. But the law need not be substantially related to each and every purpose it is intended to serve. It is enough that the law is substantially related to some important government interest. *See, e.g., Clark,* 486 U.S. at 461, 108 S.Ct. 1910. When reviewing the now repealed curfew law, this court concluded that the law's exceptions,

though not as numerous or broad as those in other curfews upheld by federal courts, afforded parents some discretion to allow their children to go out in public during curfew hours. The new curfew law's defenses are more numerous and of greater breadth. These additional defenses enhance parental authority to allow children to be in public during curfew hours. The curfew defenses permit parents to give their children increasing responsibility to stay out late as they age and mature. Surely, if the former law withstood constitutional attack, the current law with its many additional defenses does, too. As for those parents who encourage and even demand their children to be home during late evening or very early morning, (which the court suspects is the vast majority of parents of children under the age of 18), the curfew law surely supports their efforts in supervising their children and keeping them off the streets and safely within the confines of the home.

Plaintiff has urged the court to apply the strictest level of scrutiny. They rely on supplemental authority from the Florida Supreme Court, a court which has received much national attention in the last year. In *T.M. v. State,* 784 So.2d 442 (Fla.2001) (per curiam), the petitioner challenged the constitutionality of a city curfew ordinance. The appellate court held that the ordinance did not impinge on any fundamental rights of juveniles or parents. *Id.* at 443. The appellate court recognized that parents have fundamental rights in the care, custody and control of their children, but concluded that parents have no fundamental right to allow their children to be in public at night without adult supervision. In light of the significant interests at stake, the appellate court neverthe-

---

**30.** This same criticism also applies to the evidence regarding sexually transmitted diseases ("STDs"). The affidavit does not state that youth are more likely to contract STDs during curfew hours. But common sense suggests that they are.

less applied heightened scrutiny. The law was upheld. *Id.* at 443–44. Because the decision turned on the appropriate level of scrutiny, the court sought clarification through a certified question to the Supreme Court of the applicable level of scrutiny for reviewing the constitutionality of a juvenile curfew ordinance. *Id.* at 444. The State conceded that strict scrutiny applied, and the Florida Supreme Court agreed. *Id.* Not surprisingly, the court's holding is not supported by any citation to legal authority or any reasoning. The decision, therefore, does not persuade the undersigned that strict scrutiny is the appropriate level of scrutiny when reviewing a juvenile curfew law.

But even if the strict scrutiny were applied, the court believes that the curfew law satisfies even this standard. Under strict scrutiny, the law can be upheld only if it is narrowly tailored to serve a compelling government interest. *See Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Gillespie v. City of Indianapolis,* 185 F.3d 693, 708 (7th Cir. 1999), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000). The State's interest in protecting its youth from victimization and protecting the rest of the State from crimes committed by youth during curfew hours are not only important but compelling. Indeed, Plaintiff argues only that the law is not narrowly tailored to serve those interests. The court, however, remains unconvinced.

The curfew is narrow in scope. It prohibits children under fifteen from being in a public place after 11:00 p.m. or before 5:00 a.m. any day of the week. As for children aged fifteen through seventeen, it prohibits them from being in a public place between 1:00 a.m. and 5:00 a.m. on Saturday or Sunday, after 11:00 p.m. on Sunday through Thursday, and before 5:00 a.m. on Monday through Friday. The curfew affects fewer hours at night than the curfew upheld under strict scrutiny in *Qutb v. Strauss,* 11 F.3d 488, 490 (5th Cir.1993), *cert. denied,* 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994) (curfew hours were from 11 p.m. to 6 a.m. on week nights and 12 a.m. to 6 a.m. on weekends). Furthermore, the several defenses to a curfew violation narrow the scope of the curfew law and accommodate parental rights. Thus, parents may allow their children to be in public places during curfew hours under certain circumstances.[31] Parents, therefore, do maintain some control over whether, when and where their children under the age of 18 may be during curfew hours. Given the narrow scope of the curfew and its defenses, Plaintiff has not persuaded the court that the curfew law would not satisfy strict scrutiny, even if that were the appropriate level of review.

Careful consideration leads this court to the conclusion that Indiana's new curfew law withstands Ms. Hodgkins' Fourteenth Amendment challenge. Parents do not have a fundamental right to allow their minor children to be in public during curfew hours, and the curfew law appears to be substantially related to the government's interests of protecting its youth from victimization, protecting others from crimes committed by youth during curfew hours, and enhancing parent-child relationships.

---

**31.** Parents may allow their children to be in public if accompanied by them; if the children are participating in, going to, or returning from lawful employment, school sanctioned activities, religious events, emergencies, First Amendment activities, or non-profit or governmental activities providing recreation, education, training, or other care under the supervision of an adult; or if the child is engaged in interstate or international travel from a location outside of Indiana to another location outside Indiana.

### III. CONCLUSION

Plaintiffs have not made a clear showing of some likelihood of success on the merits of their claim that Indiana's new juvenile curfew is unconstitutionally overbroad and facially invalid in that it violates minors' First Amendment rights. Nor have they clearly shown some likelihood of success on the merits of their claim that the curfew law unlawfully impinges upon the substantive due process rights of parents and legal guardians to raise and control their minor children. Accordingly, Plaintiffs' motion for a preliminary injunction must be, and hereby is, **DENIED.**